U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2014 NOV 17  PM 3: 57

CLERK

BY_____
DEPUTY CLERK

DENNIS KUCERA,              )
                                   )
     Plaintiff,            )
                                   )
     v.                      )     Case No. 5:12-cv-264
                                   )
MICHAEL TKAC, GLENN CUTTING,    )
LEONARD ROBERTS, UNKNOWN POLICE )
OFFICERS, and TOWN OF HARTFORD,    )
VERMONT,                 )
                                   )
     Defendants.         )

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT
(Doc. 64)

Plaintiff Dennis Kucera ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 and under state law against Defendants Michael Tkac, Glenn Cutting, and Leonard Roberts (collectively, "Defendants"). Plaintiff alleges that Defendant Michael Tkac ("Detective Tkac") caused him to be arrested, detained, and arraigned without probable cause. Plaintiff further alleges that in Detective Tkac's affidavit in support of probable cause (the "Affidavit"), he knowingly included false statements and withheld exculpatory information. In addition to claims of false arrest, false imprisonment, and malicious prosecution, Plaintiff asserts various state law causes of action against Defendants arising out of their handling of his state criminal case, including abuse of process, negligence, intentional infliction of emotional distress, defamation, and private nuisance.

Pending before the court is a motion for summary judgment filed by Defendants. (Doc. 64.) Defendants argue that based upon the undisputed facts, they are entitled to judgment as a matter of law in their favor because Plaintiff's arrest and prosecution were supported by probable cause. In the alternative, they assert that they are entitled to

qualified immunity, as well as immunity provided to elected municipal officials pursuant to Vermont law. Plaintiff opposes the motion.

The parties waived oral argument. Plaintiff is represented by Christopher A. Dall, Esq. Defendants are represented by Joseph A. Farnham, Esq. and Nancy G. Sheahan, Esq.

## I.     The Undisputed Facts.

### A.     The September 10, 2010 Incident and Its Aftermath.

In September 2010, Plaintiff and his girlfriend, Monica Therrien, resided together in Room 130 at the Shady Lawn Motel in Hartford, Vermont. At the time, they had lived together for approximately two years.

At 9:24 p.m. on September 10, 2010, Ms. Therrien made a 911 call to the Hartford Police Dispatch ("Dispatch"). She advised that her boyfriend, whom she identified as Plaintiff, was "trying to beat her up" and that she was hurt "a little bit." (Doc. 64-5 at 1, ¶¶ 5-6.) She stated that she did not want to get Plaintiff in trouble or arrested but that she needed help and wanted law enforcement to come to speak with him. Dispatch advised her to enter the bathroom and lock the door. Ms. Therrien replied that she was already in the bathroom but that she could not lock the door.

Hartford Police Officers Christopher O'Keeffe, Stewart Rogers, and Jon Adams responded to Ms. Therrien's 911 call after being advised by Dispatch that the call involved potential domestic violence, that there was alcohol involved, that Ms. Therrien's boyfriend "Dennis" might be armed with knives, and that he was now in the room. Upon their arrival at the Shady Lawn Motel, the officers determined that the 911 call originated from Room 130 and not Room 230.

The officers entered Room 130 through an open door and encountered Plaintiff and Ms. Therrien. Officer Adams spoke with Plaintiff, who denied assaulting Ms. Therrien. When asked what was going on, Plaintiff responded that Ms. Therrien was "way, way over the limit" and that she had a "severe" alcohol problem. (Doc. 64-7 at 05:22-05:50.)

2

Officer O'Keeffe spoke with Ms. Therrien, who appeared to be intoxicated and admitted, when asked, that she was drunk, stating, "Monica is always drunk." (Doc. 64-7 at 04:42-05:00; Doc. 64-8 at 02:28-02:34.) She also stated that "she doesn't deserve to get beaten and hurt" and that she did not want Plaintiff hurting her. (Doc. 64-7 at 05:00-5:08; Doc. 64-8 at 2:34-2:40.) When asked about a visible injury, Ms. Therrien stated she had done it to herself. Ms. Therrien then told Officer O'Keeffe that Plaintiff had grabbed her by both arms and shoved her against a waist-high dresser along a wall in their room, and she pointed towards the dresser to indicate where she had been shoved. On a scale of one to ten, she ranked her pain at an eight. She told Officer O'Keeffe that she had hidden in the bathroom to keep away from Plaintiff. She asked the officers whether they could tell Plaintiff to "behave." (Doc. 64-7 at 10:00-10:05.) She showed Officers O'Keeffe and Adams her arms, asking, "[w]ould I do this to myself?" (Doc. 64-19 at 1, ¶ 3.) The officers saw no marks on Ms. Therrien's arms. After Officers O'Keeffe and Adams told Ms. Therrien several times that they could not see any evidence of an injury, Ms. Therrien became confrontational and raised her voice. Officer Adams threatened to arrest her if she continued to yell at him, and she responded, "fine, take me to jail . . . I don't want him hurting me." (Doc. 64-7 at 10:32-11:09.)

Thereafter, Ms. Therrien attempted to walk away from the officers, which led to a physical altercation between Ms. Therrien and Officer Adams. Ms. Therrien sustained an injury to her head and was arrested. An officer requested an ambulance for the "open wound" on Ms. Therrien's forehead because "her face was the first thing to hit the ground" during her arrest. (Doc. 64-7 at 12:06-12:48; 17:35-17:45.) He reported she was "semi-conscious," *id.* at 12:40-12:48, and despite numerous attempts from the officers to converse with her, she was initially non-responsive. After an ambulance arrived, emergency medical technicians ("EMTs") attended to Ms. Therrien, who continued to struggle with the EMTs and the officers. Ms. Therrien was then transported to the hospital to receive further treatment.

The officers did not immediately arrest or issue a citation to Plaintiff. Officer Adams, the senior officer at the scene, stated that he did not think they could arrest or cite

Plaintiff for a "domestic" because, among other things, Ms. Therrien did not have "any marks" on her. (Doc. 64-8 at 23:15-23:50; *see also* Doc. 64-7 at 25:58-26:07.) The officers also decided that although Ms. Therrien had been "violent" and "tumultuous," (Doc. 64-8 at 23:17-23:50), they were not going to press charges against her.

On September 20, 2010, Hartford Chief of Police Glenn Cutting ("Chief Cutting") learned that Ms. Therrien had been re-admitted to the hospital on September 12 for injuries that allegedly included broken ribs and a bruised lung. Chief Cutting was informed that these injuries were allegedly caused by the Hartford police officers involved in Ms. Therrien's arrest. In response, Chief Cutting asked the Vermont State Police ("VSP") to investigate whether the responding officers used excessive force in restraining and arresting Ms. Therrien. After VSP's investigation was completed, the Vermont Office of the Attorney General reviewed the investigation file and determined that the Hartford police officers did not use excessive force.

Chief Cutting assigned Detective Tkac to conduct an internal investigation of the September 10, 2010 incident. As part of his internal investigation, Detective Tkac reviewed Ms. Therrien's 911 call and the mobile recording devices used by Officers Adams and Rogers.[1] He also spoke with Officer O'Keeffe, who informed Detective Tkac of Ms. Therrien's statements to him during his September 10 interview wherein she stated that Plaintiff grabbed her and pushed her against a dresser in their room. Officer O'Keefe further advised that Ms. Therrien had told him that she hid in the bathroom with the door closed in an effort to keep Plaintiff away.

With the assistance of another Hartford police officer, Detective Tkac interviewed several residents of the Shady Lawn Motel, many of whom had not witnessed the September 10 incident. Ralph Diaz, who was in Room 130 with Plaintiff and Ms. Therrien prior to the officers' arrival, informed Detective Tkac that he observed Ms. Therrien yelling and throwing things and that he did not witness Plaintiff assault Ms. Therrien. Mr. Diaz further advised that he left Room 130 before Ms. Therrien's 911 call.

---

[1] There is no recording of Officer O'Keeffe because his mobile recording device was not operable during the incident.

4

For this reason, Detective Tkac "did not find him to be a particularly significant witness." (Doc. 64-10 at 4, ¶ 20.)  David Nestle, who resided in an adjoining room that shared a common wall with Room 130, advised that prior to the officers' arrival, he heard "noises like banging around and furniture moving against the wall." (Doc. 64-2 at 6, ¶ 37; Doc. 64-10 at 3-4, ¶ 16.)

Four other individuals, some of whom were not present during the September 10 incident, also provided Detective Tkac with information.  Michael Hackney told Detective Tkac that he had previously seen bruises on Ms. Therrien's arms which he believed Plaintiff caused.  Bethany Duval likewise informed Detective Tkac that she was aware that, in the past, Plaintiff had grabbed Ms. Therrien's arms and shaken her.  Two additional individuals, Crystal Butler and Brenda Hutchins, witnessed an officer kneeling on Ms. Therrien's back while handcuffing her.  Ms. Butler thought the pressure the officer used when kneeling on Ms. Therrien's back did not look "abnormal," and Ms. Hutchins stated that the officer did not "jump on" Ms. Therrien.  (Doc. 64-2 at 7, ¶¶ 38-39; Doc. 64-10 at 4, ¶¶ 17-18.)  Ms. Hutchins also told Detective Tkac that she had witnessed Ms. Therrien showing the officers the alleged bruises on her back and hip and further witnessed the responding officers stating that they saw no marks.  Susan Heyes gave Detective Tkac photographs of the alleged bruising to Ms. Therrien's back, which were taken a few days after the September 10 incident and which reveal visible marks on Ms. Therrien's back, arms, shoulder, and hip.  Detective Tkac concluded that these photographs appeared to be consistent with Ms. Therrien's allegation that Plaintiff had pushed her against a waist-high dresser.

As a result of his investigation, Detective Tkac drafted the Affidavit to support a domestic assault charge against Plaintiff.  He emailed the Affidavit to the Windsor County State's Attorney during the morning of September 24, 2010 for his review.  The State's Attorney responded that he believed there was probable cause for a misdemeanor charge, but not a felony.  Later that same day, Detective Tkac learned from a record check that Plaintiff had been arrested for domestic assault in Ohio in 2006.  At that point, Detective Tkac coordinated Plaintiff's arrest for domestic assault, which he believed was

in accordance with Rule 3(c)(8) of the Vermont Rules of Criminal Procedure, and he amended the Affidavit to support a charge of misdemeanor domestic assault in violation of 13 V.S.A. § 1042.

### B.    The Affidavit and Plaintiff's Criminal Prosecution.

The Affidavit contains certain details of Detective Tkac's investigation, including a summary of Ms. Therrien's 911 call; the responding officers' interactions with Ms. Therrien and Plaintiff, which included their recorded statements; Officer O'Keeffe's observations of and interactions with Ms. Therrien; and witness statements, with the exception of Mr. Diaz's statement. The Affidavit notes that Plaintiff was previously arrested in Youngstown, Ohio for domestic violence. With regard to Ms. Therrien's injuries, the Affidavit states that Ms. Therrien informed Officer O'Keeffe that Plaintiff had shoved her against a dresser, that the dresser "appear[ed] to be the same height as the injury" Ms. Therrien reported, and that an eyewitness, Ms. Hutchins, saw Ms. Therrien lift her shirt to show the officers her back and hip area. (Doc. 64-11 at 1, 3.) The Affidavit states that Ms. Therrien suffered a "scalp laceration" during her arrest and that, due to her "highly intoxicated state," [2] she was "taken into protective custody and shipped to DHMC [Dartmouth Hitchcock Medical Center]." *Id.* at 2. The Affidavit notes that Ms. Therrien returned to the hospital sometime after the September 10 incident for broken ribs and a bruised lung and that Plaintiff was alleging that Ms. Therrein's injuries were caused by the police officers who arrested her. The Affidavit states that "the injury caused by [Plaintiff] to [Ms.] Therrien required hospitalization and treatment." *Id.* at 4.

Plaintiff was arrested without a warrant on Friday, September 24, 2010 and lodged at the Southern State Correctional Facility pending posting of bail in the amount of $2,500. There is no evidence that there was a review of probable cause during that time period.

---

[2] The Affidavit states that Ms. Therrein's preliminary breath test revealed a blood alcohol content of .287% and that a subsequent test at the hospital revealed a blood alcohol content of .480%.

On the morning of Monday, September 27, 2010, Detective Tkac finalized and signed the Affidavit, which was forwarded to the Windsor County State's Attorney's Office and filed with the court. Later that same day, Detective Tkac conducted a second interview of Mr. Diaz, whose statements conformed to his earlier statements that he was present in Room 130 on the night of incident, that he did not see Plaintiff assault Ms. Therrien, and that he left Room 130 before Ms. Therrien called 911.

After the Affidavit was signed and forwarded to the Windsor County State's Attorney's Office, on September 27, Detective Tkac met with a Victim's Advocate and interviewed Ms. Therrien. Ms. Therrien advised that she had not suffered any broken ribs, but instead experienced a collapsed lung caused by a foreign object lodged in her lung. She recanted her earlier statements during the 911 call and during her interview with Officer O'Keeffe at the Shady Lawn Motel, and she insisted that Plaintiff had "never hurt [her] before" and had not hurt her on September 10. (Doc. 65-3 at 8-9, 17-23, 31.) She advised that the injuries to her back and shoulder were "road rash." *Id.* at 10, 47. She did not provide a written statement, although the interview was recorded and later transcribed.

On September 27, 2010, Plaintiff was arraigned in Vermont Superior Court. Ms. Therrien was present for Plaintiff's arraignment. Plaintiff was represented by counsel who did not challenge the Affidavit or the court's finding of probable cause. Plaintiff's counsel, however, advised the court that she had spoken with Ms. Therrien and that Ms. Therrien wished to have contact with Plaintiff. The court denied this request and released Plaintiff subject to conditions of release that prohibited Plaintiff from contacting Ms. Therrien and from harassing or abusing her. While the no-contact condition was in place, Plaintiff continued to reside in Room 130 at the Shady Lawn Motel, while Ms. Therrien stayed in a separate room at the motel.

Plaintiff subsequently retained Christopher A. Dall, Esq., who filed a motion to amend Plaintiff's conditions of release to allow contact between Plaintiff and Ms. Therrien. The court held an evidentiary hearing on the motion on October 19, 2010. Ms. Therrien testified that Plaintiff had not injured her and that she wanted to reside with him

because she did not feel "threatened" by him and felt "safe when he's around." (Doc. 65-4 at 13.) She further testified that she called 911 during the incident and that she did "not believe" she had lied to the officers. *Id.* at 16. The court subsequently modified Plaintiff's conditions of release to allow him to have contact with Ms. Therrien. The condition of release prohibiting Plaintiff from harassing or abusing Ms. Therrien remained intact. Thereafter, Ms. Therrien and Plaintiff resumed living together in the same room at the Shady Lawn Motel.

At some point after Plaintiff's arraignment, Hartford Deputy Chief of Police Leonard Roberts ("Deputy Chief Roberts") met with Mayur Patel, who was the manager of the Shady Lawn Motel ("Manager Patel"). Deputy Chief Roberts advised Manager Patel of Plaintiff's condition of release which prohibited Plaintiff from harassing or abusing Ms. Therrien, but Deputy Chief Roberts never "told" him or "suggested" that he evict Plaintiff. (Doc. 64-16 at 1.) Chief Cutting, Deputy Chief Roberts, Manager Patel, and Shady Lawn Motel owner, Harry Patel ("Owner Patel") met to further discuss the situation, during which Chief Cutting and Deputy Chief Roberts expressed concern for Ms. Therrien's safety if she continued to reside with Plaintiff. Both Chief Cutting and Deputy Chief Roberts knew that the no-contact condition had been removed, and neither suggested, directed, or pressured the Patels to evict or ask Plaintiff to leave the Shady Lawn Motel. Nonetheless, Manager Patel questioned Plaintiff on three separate occasions regarding whether Plaintiff and Ms. Therrien could reside together and whether both could remain residents of the Shady Lawn Motel. After Plaintiff provided both the Patels with a copy of his modified conditions of release that allowed contact with Ms. Therrien, there were no further discussions regarding Plaintiff's eviction. Plaintiff was never evicted from the Shady Lawn Motel, and Plaintiff and Ms. Therrien continued to cohabitate there until they moved to Florida in August of 2011.

On November 10, 2010, the Windsor County State's Attorney contacted Plaintiff's attorney to advise him that evidence regarding Plaintiff's case was available. The evidence, compiled on DVDs, included the recordings from the responding officers' mobile recording devices, photographs of Ms. Therrien's injuries, the interview with Ms.

Therrien, and the interviews with other residents from the motel, including Mr. Diaz. Plaintiff contends that this was his first notice that Ms. Therrien had recanted her allegations on September 27 and that Mr. Diaz confirmed that he had not witnessed an assault. On March 31, 2011, the domestic assault charge against Plaintiff was dismissed without prejudice. It is not clear whether the dismissal was in response to a motion to dismiss filed by Plaintiff.

**C.      Hartford Police Department's Training on Domestic Violence.**

According to Chief Cutting, Hartford police officers are required to receive domestic violence training every other year. In training, officers are advised that victims of domestic violence often recant their initial allegations of abuse and that the crime of domestic violence has a high recidivism rate. Plaintiff's expert witness on the subject of appropriate police practices agrees with Hartford's domestic violence training.

At the time of the September 10, 2010 incident, Detective Tkac had twenty-three years of law enforcement experience which included training on domestic violence. As part of his training, Detective Tkac had been taught that it is "common" for victims of domestic violence to recant their initial statements to police out of embarrassment and/or fear of their abusers. (Doc. 64-2 at 5, ¶ 31; Doc. 64-10 at 1-2, ¶¶ 5-6.) Detective Tkac had also been taught that a victim's earlier statements "made in close proximity" to the alleged abuse are "generally" considered more accurate than the victim's subsequent statements. (Doc. 64-10 at 2, ¶ 6.) Detective Tkac was aware that the victim is often the only witness to a crime of domestic violence and that the crime has a high recidivism rate.

**D.      Whether There Are Disputed, Material Facts.**

Plaintiff contends that Chief Cutting and Deputy Chief Roberts "falsely" informed the Patels that Plaintiff's conditions of release prohibited him from continuing to reside at the Shady Lawn Motel when, in fact, there was no such court order or condition of release. (Doc. 65 at 10-11.) As the basis for this assertion, Plaintiff claims that the Patels told him on several occasions that Chief Cutting and Deputy Chief Roberts advised "that [Plaintiff] could not reside at the Shady Lawn Motel while [Ms.] Therrien was also a

resident at the motel." (Doc. 65-1 at 3, ¶ 18.) Similarly, in his deposition, Plaintiff testified that Manager Patel told him that "he was being pressured by the police" to evict Plaintiff and that the police had told him that Plaintiff and Ms. Therrien could no longer reside together at the motel. (Doc. 64-3 at 18.)

Plaintiff does not explain how the Patels' hearsay statements are admissible. *See* Fed. R. Civ. P. 56(c) (requiring evidence in support of or in opposition to summary judgment be admissible); *see also Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.") (internal quotation marks omitted). In the absence of that explanation, the court disregards them for purposes of summary judgment. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (holding "unsupported allegations do not create a material issue of fact" that would preclude summary judgment). In doing so, the court notes that, even if the statements are considered, they do not create a material issue of fact because it is undisputed that, once Plaintiff's conditions of release were modified to allow contact with Ms. Therrien, Plaintiff was neither evicted nor prohibited from residing with Ms. Therrien at the Shady Lawn Motel. He thus identifies no right or interest of his that was infringed as a result of the alleged interaction between the Hartford Police and the Patels.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A fact is 'material' . . . when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be

10

drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. [Rather], the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks, citations, and footnotes omitted).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see also McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

### B.      Plaintiff's Claims and the Pending Motion.

Plaintiff alleges violations of his constitutional rights arising out of his arrest and prosecution in state court. Count One of his Amended Complaint asserts a violation of 42 U.S.C. § 1983 arising out of Detective Tkac's alleged deliberate indifference to Plaintiff's constitutional rights by arresting Plaintiff without probable cause and by subjecting him to detention and conditions of release based on an intentionally or recklessly false affidavit that omitted exculpatory information. These same factual

allegations underpin Plaintiff's state law claims for false arrest and abuse of process
(Count Three), false imprisonment (Count Four), and malicious prosecution (Count
Five).

Defendants seek summary judgment on each of Plaintiff's claims, arguing that the
undisputed facts establish probable cause to arrest and prosecute Plaintiff for domestic
assault. Accordingly, as a threshold issue, the court addresses the existence of probable
cause. *See Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (directing that "the
probable cause inquiry may precede any inquiry into qualified immunity because there
cannot be an allegation of a constitutional violation where probable cause justifies an
arrest and prosecution").

### C.      Whether Probable Cause Existed to Arrest and Charge Plaintiff.

"Probable cause is a complete defense to a constitutional claim of false arrest and
false imprisonment." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (citing *Singer v.
Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Zanghi v. Inc. Vill. of Old
Brookville*, 752 F.2d 42, 45 (2d Cir. 1985)). This defense applies whether the "action is
brought under state law or under § 1983." *Gonzalez v. City of Schenectady*, 728 F.3d
149, 155 (2d Cir. 2013) (internal quotation marks omitted); *see also Kent v. Katz*, 327
F. Supp. 2d 302, 306 (D. Vt. 2004), *aff'd*, 125 F. App'x 334 (2d Cir. 2005) (noting that a
federal and state (Vermont) claim of unlawful arrest "must fail if there was probable
cause for the arrest"). "Given that a lack of probable cause is a necessary element for
malicious prosecution," the existence of probable cause also defeats a claim of malicious
prosecution. *Lay v. Pettengill*, 2011 VT 127, ¶ 31, 191 Vt. 141, 159, 38 A.3d 1139,
1151; *see also Betts*, 751 F.3d at 82 ("[C]ontinuing probable cause is a complete defense
to a constitutional claim of malicious prosecution.").

"Probable cause does not require absolute certainty." *Boyd v. City of New York*,
336 F.3d 72, 76 (2d Cir. 2003). It also "does not require the same type of specific
evidence of each element of the offense as would be needed to support a conviction."
*Adams v. Williams*, 407 U.S. 143, 149 (1972). "'[P]robable cause requires only a
probability or substantial chance of criminal activity, not an actual showing of such

activity.'" *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)).

"Probable cause exists when the facts and circumstances known to an officer are sufficient to lead a reasonable person to believe that a crime was committed and that the suspect committed it." *State v. Chicoine*, 2007 VT 43, ¶ 8, 181 Vt. 632, 633, 928 A.2d 484, 487; *accord Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010). The existence of probable cause is an objective inquiry that "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

> Accordingly, a court considering a summary judgment motion in a false-arrest or malicious-prosecution case must construe in favor of the non-moving party any factual disputes regarding what circumstances were known to the officer at the relevant time. After that, however, the court must undertake a neutral, legal analysis of whether those (assumed) circumstances satisfy the probable-cause standard. In other words, the court should resolve in favor of the non-moving party any disputes about what information the officer knew, but it should *neutrally* determine whether that information gave rise to probable cause. An objectively reasonable police officer applying the probable-cause standard would not automatically or necessarily construe all available information in favor of a particular individual, and neither should the court.

*Benn v. Kissane*, 510 F. App'x 34, 37 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 78 (2013) (citing *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007)).

In this case, Plaintiff was arrested for and charged with violating 13 V.S.A. § 1042, which provides that "[a]ny person who attempts to cause or wilfully or recklessly causes bodily injury to a family or household member, or wilfully causes a family or household member to fear imminent serious bodily injury shall be" imprisoned or fined or both. "Household members" are defined as "persons who, for any period of time, are living or have lived together, are sharing or have shared occupancy of a dwelling, are engaged in or have engaged in a sexual relationship, or minors or adults who are dating or who have dated." 15 V.S.A. § 1101(2). "Bodily injury" is defined as "physical pain,

illness or any impairment of physical condition." 13 V.S.A. § 1021(1). The undisputed facts reveal that, at the time of his arrest, Plaintiff and Ms. Therrein were "household members" and Ms. Therrien had clearly suffered a "bodily injury." The only issue was who caused Ms. Therrien's injuries.

On September 10, 2010, Ms. Therrien made several statements to 911 Dispatch and the police officers who arrived on the scene that she was in fear of Plaintiff and that he had assaulted her by shoving her against a waist-high dresser. She attempted to show the officers her injuries by lifting up her shirt and exposing her back. The Hartford Police officers who responded to the incident questioned Ms. Therrien's claim because she appeared to have no visible injuries and because her veracity was further called into question by her visible and admitted intoxication. Plaintiff can claim no injury as a result of the initial police response to Ms. Therrien's 911 call as he was neither cited nor arrested at that time.

Thereafter, Detective Tkac amassed additional evidence which included Ms. Therrien's statements on the night of the incident to other officers on the scene, some of which were captured on the officers' mobile recording devices; photographs taken after the incident depicting bruising on Ms. Therrien's back and hip consistent with her being shoved against a waist-high dresser; and statements from other residents of the Shady Lawn Motel that supported a conclusion that there was an altercation in Room 130 which involved Plaintiff and Ms. Therrien, that during the altercation there was banging and what sounded like furniture moving against the common wall, and that witnesses to Ms. Therrien's arrest did not see conduct by the police officers that would give rise to injuries on Ms. Therrien's back and hips. In addition, residents reported this was not the first instance in which Plaintiff had allegedly used physical force against Ms. Therrien. Detective Tkac used this additional information to draft and finalize the Affidavit and in doing so sought guidance from the Windsor County State's Attorney. *See United States v. Thomas*, 2013 WL 6000484, at *26 (D. Vt. Nov. 8, 2013) (noting the fact that the affiants sought the prosecutor's guidance and approval of search warrant applications supported a finding of good faith and reasonableness).

14

In the Second Circuit, "it is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (internal quotation marks omitted); *see also Garcia v. Gasparri*, 193 F. Supp. 2d 445, 452 (D. Conn. 2002) ("Second Circuit case law makes clear that an officer can base his determination of probable cause on the statements of victims at the scene of the crime."). Accordingly, based upon the statements of Ms. Therrien alone, Detective Tkac arguably had probable cause to arrest Plaintiff, although the lack of physical evidence of her injuries and her intoxication raised sufficient doubts that it was reasonable and appropriate for Detective Tkac to refrain from preceding solely on the basis of Ms. Therrien's statements. *See Singer*, 63 F.3d at 119 (holding a law enforcement officer has probable cause to arrest if "advised of a crime by a person who claims to be the victim" and "absent circumstances that raise doubts as to the victim's veracity"); *see also Gardenhire v. Schubert*, 205 F.3d 303, 322 (6th Cir. 2000) (holding that "a crime victim's accusation standing alone can establish probable cause").

Plaintiff's denial of guilt, while relevant, is by no means dispositive because "an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." *Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006). Courts have thus "found probable cause where a police officer was presented with different stories from an alleged victim and the arrestee." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). Moreover, "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)). Correspondingly, when a police officer has the "facts sufficient to establish probable cause," he or she is required "to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts

sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.").

The Second Circuit has found probable cause despite "the lack of physical evidence of an assault on [the alleged victim's] body . . . when [she] had reported that she had been assaulted." *Betts*, 751 F.3d at 83. In this case, Detective Tkac acquired photographs of actual bodily injuries to Ms. Therrien consistent with Plaintiff pushing her against a waist-high dresser. Several Shady Lawn Motel residents provided statements to Detective Tkac that indicated Plaintiff had a history of being violent with Ms. Therrien. *See Caldarola v. Calabrese*, 298 F.3d 156, 165 (2d Cir. 2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.") (internal quotation marks omitted). Detective Tkac also discovered Plaintiff's prior arrest for domestic violence in Ohio. This new evidence, when combined with the facts and circumstances of the September 10 incident, was sufficient to cause a reasonable person to credit Ms. Therrien's initial report that Plaintiff assaulted her by grabbing her arms and shoving her against a waist-high dresser and causing her bodily injury.

Because the existence of probable cause is a "complete defense" to state and federal claims of false arrest and false imprisonment, Detective Tkac is entitled to judgment as matter of law in his favor on those claims. *Betts*, 751 F.3d at 82.[3] Detective

---

[3] Even in the absence of actual probable cause, an officer may be entitled to assert qualified immunity based on "arguable probable cause." *See Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012). "[A] police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007) (internal quotation marks omitted). Because "the right to be free from arrest without probable cause" was "clearly established" at the time of Plaintiff's arrest, Detective Tkac is entitled to summary judgment if his "probable cause determination was objectively reasonable." *Id.* "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest," *id.*, which "exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d

Tkac's motion for summary judgment is therefore GRANTED with respect to Counts
One, Three, and Four of the Amended Complaint.

### D.   Whether Post-Arrest Evidence Negated a Finding of Probable Cause.

A finding of probable cause, however, does not defeat a claim of malicious
prosecution if a plaintiff can establish that "the probable cause that existed at the time of
his arrest had been nullified by information establishing [his] innocence." *Kinzer v.
Jackson*, 316 F.3d 139, 143 (2d Cir. 2003). "In order for probable cause to dissipate, the
groundless nature of the charge must be made apparent by the discovery of some
intervening fact." *Id.* at 144 (internal quotation marks and citations omitted). "The tort
of malicious prosecution is not favored," and the Vermont Supreme Court has been
"reluctant to use it to chill legitimate law enforcement activities." *Cook v. Nelson*, 712
A.2d 382, 385 (Vt. 1998) (internal citations omitted). "To prevail on such claim, a
plaintiff must ordinarily plead and prove not only the retaliatory basis for inciting the
prosecution but also that the prosecution was instituted without probable cause." *Lay*,
2011 VT 127, ¶ 21, 191 Vt. at 152, 38 A.3d at 1146.

Plaintiff argues that the groundless nature of the charge against him became
apparent when Ms. Therrien recanted her allegations on September 27. Courts generally
recognize that "a recantation is not unusual in domestic violence cases" because
"[v]ictims of this type of violence often are protective of, and deny allegations against,
their abusers." *United States v. Carthen*, 681 F.3d 94, 103 (2d Cir. 2012), *cert. denied*,
133 S. Ct. 837 (2013). Detective Tkac received training that victims of domestic
violence often recant out of fear of their abusers or embarrassment, and he was entitled to
consider Ms. Therrien's recantation in light of this training and experience. *See Okin v.
Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431-32 (2d Cir. 2009) ("The
serious and unique risks and concerns of a domestic violence situation are well known
and well documented. The officers' awareness of the serious consequences of domestic

---

Cir. 2013) (internal quotation marks omitted). Here, in the absence of actual probable cause,
Detective Tkac would be entitled to qualified immunity because "it was objectively reasonable
for [him] to believe that probable cause existed" based on the information gleaned in the course
of his investigation. *Id.* (internal quotation marks omitted).

17

violence is further supported by their training and their knowledge[.]") (footnote omitted).  He was also aware that Plaintiff had previously been arrested for domestic assault in Ohio and that the crime has a high rate of recidivism.

Moreover, although Ms. Therrien subsequently testified under oath that Plaintiff did not harm her, she also testified under oath that her statements to Dispatch and the officers on the scene on September 10 were true.  Accordingly, at best, her recantation was partial in nature and did not establish that the charge for which Plaintiff was arrested was "groundless" or that Plaintiff was innocent.  The existence of probable cause thus remains unchanged. *Kinzer*, 316 F.3d at 143-44 (internal quotation marks omitted).

Because "continuing probable cause is a complete defense" to a claim of malicious prosecution, *Betts*, 751 F.3d at 82, Detective Tkac is entitled to judgment as a matter of law in his favor with respect to this claim.[4]  The court therefore GRANTS Detective Tkac's motion for summary judgment with respect to Count Five of the Amended Complaint.

## E.    Whether the Affidavit Contained Material Misstatements or Omissions.

In Count Three of his Amended Complaint, Plaintiff asserts a claim of abuse of process on the grounds that Detective Tkac's use of legal process was "neither warranted nor authorized by law" because there were "no facts to establish a prima facie case that [Plaintiff] assaulted [Ms.] Therrien." (Doc. 33 at 6.)  Under Vermont law, "a plaintiff alleging the tort of abuse of process is required to plead and prove: '1) an illegal, improper or unauthorized use of a court process; 2) an ulterior motive or an ulterior

---

[4] Dismissal is warranted for the further reason that the Vermont Supreme Court has concluded that, "[w]here the entry of *nolle prosequi* is a mere act of the prosecuting attorney, and no action of the court is had upon it, the entry would not be an end of the proceeding, and for that reason would not warrant any action for malicious prosecution." *Driggs v. Burton*, 44 Vt. 124, 124 (1871).  Under Vermont law, proceedings are considered to have terminated in favor of the accused "'only when their final disposition is such as to indicate the innocence of the accused.'" *Lay v. Pettengill*, 2011 VT 127, ¶ 33, 191 Vt. 141, 160, 38 A.3d 1139, 1152 (quoting Restatement (Second) of Torts § 660 cmt. a).  Accordingly, "[a] *nol pros* signifies termination of charges in favor of the accused only when their final disposition is such as to indicate the innocence of the accused." *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (internal quotation marks omitted).  Here, the dismissal does not indicate Plaintiff's innocence.

purpose; and 3) resulting damage to the plaintiff.'" *Wharton v. Tri-State Drilling &*
*Boring*, 2003 VT 19, ¶ 11, 175 Vt. 494, 496, 824 A.2d 531, 536 (quoting *Jacobsen v.*
*Garzo*, 542 A.2d 265, 268 (Vt. 1988)). Assuming *arguendo* that Plaintiff could proffer
facts to establish a genuine dispute regarding Detective Tkac's motive and resulting
damages,[5] Detective Tkac's Affidavit was an authorized use of a court process that
"accomplished that which it [was] legally intended to do"—to provide information for the
issuing judge regarding the existence of probable cause. *Blydenstein v. Precourt*, 541
A.2d 1198, 1198 (Vt. 1988). As a result, the only question is whether the Affidavit was
"legal" and "proper." Plaintiff claims that the Affidavit fails this test because Detective
Tkac withheld two pieces of evidence and materially mischaracterized a third piece of
evidence, which, if supplied and corrected, would render it impossible for a judge to
conclude that a prima facie case of domestic assault had been established. "In order to
mount such a challenge, the plaintiff must make a 'substantial preliminary showing' that
the affiant knowingly and intentionally, or with reckless disregard for the truth, made a
false statement in his affidavit and that the allegedly false statement was 'necessary to the
finding of probable cause.'" *Golino v. City of New Haven*, 950 F.2d 864, 870-71 (2d Cir.
1991) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

"Intentional or reckless omissions of material information, like false statements,
may serve as the basis for a *Franks* challenge[.]" *Id.* at 871 (citing *United States v.*
*Campino*, 890 F.2d 588, 592 (2d Cir. 1989)). To determine whether an omission was
material, the court must insert the omitted facts and ask "whether, if the omitted material
had been included in the affidavit, the affidavit would still establish probable cause[.]"
*United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (internal quotation marks

---

[5] Plaintiff proffers no evidence to support the allegations he made in his deposition that Detective
Tkac initiated the criminal prosecution against Plaintiff to deflect accusations that the Hartford
officers had injured Ms. Therrien during her arrest and instead "to pin those injuries" on
Plaintiff. (Doc. 64-3 at 28.)

19

and citations omitted).[6]  "The materiality of a misrepresentation or an omission" depends, in part, "on whether the information is relevant to the probable cause determination under controlling substantive law." *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (internal quotation marks omitted).  "While the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause, he must not omit circumstances that are critical to its evaluation." *Id.* (internal quotation marks omitted); *accord Walczyk v. Rio*, 496 F.3d 139, 161 (2d Cir. 2007).

Contrary to Plaintiff's contention, Detective Tkac did not intentionally or recklessly omit from the Affidavit Ms. Therrien's September 27th recantation.  Instead, the undisputed facts establish that he submitted the Affidavit to the State's Attorney prior to Ms. Therrien's recantation.  The question thus becomes whether he had an affirmative duty to "correct" the Affidavit with new information after it had been filed.  Independent of a duty in the course of a criminal prosecution to disclose exculpatory evidence, Plaintiff cites no authority for the proposition that affidavits in support of probable cause must be "corrected" by subsequently acquired information, or that there is a civil cause of action for the failure to do so.[7]

---

[6]Although *Franks* and *Rajaratnam* are criminal cases involving the suppression of evidence, the Second Circuit has adopted this same test in civil claims for false arrest.  *See, e.g.*, *Escalera v. Lunn*, 361 F.3d 737, 743-44 (2d Cir. 2004) (explaining that for a § 1983 claim for false arrest, under the "corrected affidavits doctrine," "[o]nly if the corrected affidavit would not support a reasonable officer's belief that probable cause existed would the identified factual disputes be material to resolving the issue") (internal quotation marks omitted); *Loria v. Gorman*, 306 F.3d 1271, 1289 (2d Cir. 2002) (holding that, for a § 1983 claim for false arrest, the court must "assess the materiality of alleged misstatements in a warrant application by putting aside allegedly false material, supplying any omitted information, and then determining whether the contents of the corrected affidavit would have supported a finding of probable cause") (internal quotation marks and brackets omitted).

[7] "[T]he prosecutor must disclose 'material' . . . exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made," and the Second Circuit has "never interpreted due process of law as requiring more than that *Brady* material must be disclosed in time for its effective use at trial." *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001).  With regard to

Detective Tkac's alleged omission of Mr. Diaz's initial statement taken prior to September 27, that he witnessed no assault while in Room 130 but saw Ms. Therrien yelling and throwing things around, presents a closer question because it is undisputed that Detective Tkac had this information before the Affidavit was filed. However, the omitted statement is not clearly exculpatory. Mr. Diaz merely stated that while he was in Room 130, Plaintiff did not assault Ms. Therrien, who was yelling and throwing things. Mr. Diaz acknowledged that he left Room 130 before Ms. Therrien placed her 911 call. He therefore could not attest to whether Plaintiff assaulted Ms. Therrien after he left. *See Nelson v. Hernandez*, 524 F. Supp. 2d 212, 225 (E.D.N.Y. 2007) (holding that truly exculpatory evidence provides "conclusive proof of [the plaintiff's] innocence").

---

whether there would have been an obligation to provide exculpatory material upon Plaintiff's request, the Second Circuit has stated:

> In nearly four decades of jurisprudence, the Supreme Court has never suggested that the reference [to "on demand of an accused"] reflected a constitutional duty to disclose *Brady* and *Giglio* materials as soon after indictment as such materials are requested. Indeed, a rule that makes the timing of disclosure dependent on the defendant's demand is directly contrary to the principle that a prosecutor's *Brady* obligation is independent of a defendant's request for *Brady* materials.

*Id.* at 144 (citing *United States v. Bagley*, 473 U.S. 667, 682-83 (1985) (explaining that a defendant's failure to request *Brady* material does not free a prosecutor of its obligation to disclose such material)). The elements of a *Brady*-type violation are the same under Vermont law. *See State v. LeClaire*, 2003 VT 4, ¶ 8, 175 Vt. 52, 56, 819 A.2d 719, 723 ("There are three elements of a true *Brady* violation: (1) the State must have suppressed evidence; (2) that evidence must be favorable to the defendant because it is either exculpatory or impeaching; and (3) the defendant was prejudiced as a result."). The Vermont Supreme Court has held that, when "the defendant has notice of the essential facts which would allow the defendant to take advantage of any exculpatory evidence, and fails to do so, the defendant cannot then argue under *Brady* that the prosecution suppressed or failed to disclose such evidence." *State v. Tester*, 2007 VT 40, ¶ 16, 181 Vt. 506, 512, 923 A.2d 622, 627 (internal quotation marks omitted). In this case, Plaintiff was aware of Ms. Therrien's recantation because his counsel called her as a witness at an October 19, 2010 hearing in which she recanted at least some of her allegations. He was thus in possession of the operative facts regarding Ms. Therrien well before the prosecution's November 10 production of discovery so that he had "notice of the essential facts [to] allow [him] to take advantage of [that] exculpatory evidence" at trial. *Id.* at ¶¶ 16-17, 181 Vt. at 512, 923 A.2d at 627 (concluding that no *Brady* violation had occurred, despite the State's failure to disclose a videotaped interview of the victim, when the defendant was "well aware" of the existence and contents of the interview).

Accordingly, even if Mr. Diaz's statement was included, the evidence in support of probable cause in the corrected Affidavit "would still have been sufficient." *Escalera v. Lunn*, 361 F.3d 737, 743-44 (2d Cir. 2004). Mr. Diaz's statement, therefore, was not "necessary" to the determination of probable cause. *Id.* at 743 (internal quotation marks omitted).

As part of his abuse of process claim, Plaintiff further contends that Detective Tkac falsely asserted in the Affidavit that Plaintiff caused an injury that required Ms. Therrien to be hospitalized. The Affidavit sets forth the following facts: (1) Ms. Therrien reported that Plaintiff shoved her against a dresser, which "appear[ed] to be the same height as the injury reported by [Ms.] Therrien to her back"; (2) one witness observed Ms. Therrien lift her shirt to show the officers bruises on her hip and back, which they were unable to see at that time; (3) another individual subsequently provided photographs of injuries on Ms. Therrien's back that "correspond[ed] to the injury [Ms.] Hutchins saw [Ms.] Therrien attempting to show the officers"; (4) during the September 10 incident, Ms. Therrien fell after Officer Adams attempted to stop her from leaving and sustained an "scalp laceration"; (5) Ms. Therrien was then taken into protective custody and "shipped to" the hospital due to her "highly intoxicated state"; (6) two witnesses observed an officer kneel on Ms. Therrien's back while handcuffing her; (7) Ms. Therrien later returned to the hospital for injuries which reportedly included broken ribs and a bruised lung; and (8) that, in summary, "the injury caused by [Plaintiff] to [Ms.] Therrien required hospitalization and treatment." (Doc. 64-11 at 1-4.)

When the Affidavit was filed, Ms. Therrien alleged Plaintiff's assault caused injuries to her back and hip. Plaintiff does not explain why, in the absence of expert medical evidence, it would be "false" to attribute the injuries to her ribs and lung to the alleged assault as opposed to the circumstances of Ms. Therrien's arrest, which appeared to cause injuries primarily to her face and scalp. By explaining in the Affidavit both possible sources of Ms. Therrien's injuries for which she "required hospitalization and treatment," (Doc. 64-11 at 4), Detective Tkac did not omit information "critical to the probable cause determination." *Golino*, 950 F.2d at 871. The judge evaluating probable

22

cause could thus make his or her own determination regarding the strength of the evidence supporting causation. In any event, neither hospitalization nor treatment are required to establish a misdemeanor charge of domestic assault. Under 13 V.S.A. § 1042, a "fear [of] imminent serious bodily injury" is sufficient, and if actual bodily injury is alleged it need only consist of "physical pain, illness or any impairment of physical condition." 13 V.S.A. § 1021(1). The Affidavit noted that Ms. Therrien ranked her pain an eight on a scale of one to ten and that the bruising depicted in photographs of her body arguably "correspond[ed]" with the testimony of the eye-witness who reported seeing Ms. Therrien showing the officers her back prior to her arrest. (Doc. 64-11 at 3.)

Because Detective Tkac had continuing probable cause to prosecute Plaintiff for domestic assault and because his Affidavit was not materially misleading, Plaintiff cannot establish "an illegal, improper or unauthorized use of a court process." *Jacobsen*, 542 A.2d at 268. As Plaintiff is "unable to prove at least one of the essential elements" of his abuse of process claim, Detective Tkac is entitled to judgment as a matter of law in his favor on that claim. *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014) (internal quotation marks and citations omitted). The court therefore GRANTS Detective Tkac's motion for summary judgment with respect to the abuse of process claim asserted in Count Three.

## F.      Whether Detective Tkac Wrongfully Withheld Information.

Plaintiff asserts an independent claim based on Detective Tkac's alleged withholding of information from Plaintiff, his counsel, and the court during the course of his state prosecution. The Second Circuit recognizes a civil claim for the "mishandling or suppression of exculpatory evidence." *Russo v. City of Bridgeport*, 479 F.3d 196, 205 (2d Cir. 2007) (internal quotation marks omitted). Such a claim requires proof of the following: "(1) that [the plaintiff] has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct shocks the conscience." *Id.* (internal quotation marks omitted). The claim seeks

to protect against "a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence." *Id.* at 208.

In *Baker v. McCollan*, 443 U.S. 137 (1979), the Supreme Court considered a detention extending from December 30 to January 2, during which the police withheld exculpatory information, and concluded that "a detention of three days over a New Year's weekend does not and could not amount to such a deprivation" sufficient to establish a constitutional violation. *Id.* at 141, 144-45. In this case, Plaintiff was detained from his arrest on September 24 until his arraignment and release on September 27. During that time period, the only allegedly exculpatory information the police possessed was Mr. Diaz's statement that he did not witness an assault. Ms. Therrien did not partially recant her allegations until the day of Plaintiff's arraignment—the same day on which Plaintiff was released.

Because there was no clearly exculpatory evidence that would have required or even supported Plaintiff's release prior to September 27, Plaintiff cannot establish, as a matter of law, that he suffered a "continued" and "sustained" detention, *Russo*, 479 F.3d at 205, 208, during which the police wrongfully withheld exculpatory information. *Cf. Baker*, 443 U.S. at 141 (noting police held exculpatory evidence because they could have compared the plaintiff's appearance against a file photograph of the wanted man which would have exonerated plaintiff). Because Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," Detective Tkac is therefore entitled to summary judgment on Plaintiff's wrongful withholding of evidence claim. *Celotex Corp.*, 477 U.S. at 322.

## G. Whether Detective Tkac Is Entitled to Summary Judgment on Plaintiff's Remaining State Law Claims.

### 1. Intentional Infliction of Emotional Distress.

"To sustain a claim for [intentional infliction of emotional distress,] plaintiff must show defendants engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of

24

extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399, 848 A.2d 344, 347 (internal quotation marks omitted). "A plaintiff's burden on a claim of [intentional infliction of emotional distress] is a heavy one." *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002) (internal quotation marks omitted). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Denton v. Chittenden Bank*, 655 A.2d 703, 706 (Vt. 1994) (internal quotation marks and ellipses omitted). "The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). Under Vermont law, the trial court "makes the initial determination of whether a jury could reasonably find that the alleged conduct satisfies all the elements of an [intentional infliction of emotional distress] claim." *Fromson*, 2004 VT 29, ¶ 14, 176 Vt. at 399, 848 A.2d at 347.

When a plaintiff relies on a "series of events" to attempt to establish outrageous conduct, then the plaintiff must make a "showing" of at least one "significant outrageous act." *Fromson*, 2004 VT 29, ¶ 17, 176 Vt. at 401, 848 A.2d at 348; *see also Dulude*, 807 A.2d at 399 ("[I]ncidents that are themselves insignificant should not be consolidated to arrive at the conclusion that the overall conduct was outrageous."). Here, Plaintiff points to a "series" of alleged deficiencies regarding Detective Tkac's investigation, including that he withheld exculpatory information and misstated other information. However, even were the court to find Detective Tkac's investigation "inadequate or incomplete," it was not "outrageous in the extreme" because he made "some effort" to investigate Ms. Therrien's allegations, including interviewing witnesses, speaking with Officer O'Keeffe, reviewing the 911 call, and seeking the review, advice, and approval of the State's Attorney. *Baptie v. Bruno*, 2013 VT 117, ¶ 25, 88 A.3d 1212, 1219 (affirming grant of summary judgment when defendant, a police officer, "made some effort to locate and

charge" the suspect, even though the investigation proved "inadequate" and "incomplete," because such conduct "cannot be considered outrageous in the extreme").

Similarly, even were the court to find that Detective Tkac had "improper motives," the Vermont Supreme Court has "declined to find outrageous conduct based solely on the alleged illegal motives underlying the conduct." *Fromson*, 2004 VT 29, ¶ 18, 176 Vt. at 401, 848 A.2d at 349. It is thus not "enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, cmt. d.

As a matter of law, Detective Tkac's conduct was thus not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community." *Farnum*, 671 A.2d at 1256. For this reason, Detective Tkac is entitled to summary judgment in his favor on Plaintiff's intentional infliction of emotional distress claim. *See Denton*, 655 A.2d at 706 (affirming grant of summary judgment because the alleged conduct "did not, as a matter of law, reach the level of extreme outrage" sufficient for such a claim). Detective Tkac's motion for summary judgment on Count Six is therefore GRANTED.

### 2. Defamation.

Under Vermont law, "the familiar elements of defamation, which comprises libel and slander," include the following:

> (1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable *per se*; and (6) some actual harm so as to warrant compensatory damages.

*Russin v. Wesson*, 2008 VT 22, ¶ 5, 183 Vt. 301, 303, 949 A.2d 1019, 1020 (citing *Lent v. Huntoon*, 470 A.2d 1162, 1168 (Vt. 1983)).

"Public policy requires that certain communications, though defamatory, are privileged, and may not serve as the basis for a defamation action." *Boice v. Unisys*

26

*Corp.*, 50 F.3d 1145, 1149 (2d Cir. 1995). "The Vermont Supreme Court has framed the essential elements of a defamation claim in such a way that it appears that a plaintiff must establish that a statement is not privileged as part of his or her case-in-chief." *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 725 (D. Vt. 2012), *aff'd*, 570 F. App'x 66 (2d Cir. 2014).

Vermont law recognizes a litigation privilege that extends to statements within documents filed in a judicial proceeding. *See O'Connor v. Donovan*, 2012 VT 27, ¶ 26, 191 Vt. 412, 427, 48 A.3d 584, 594 (recognizing that "'[a] witness is absolutely privileged to publish defamatory matter . . . as a part of a judicial proceeding in which he is testifying") (alteration in original) (quoting Restatement (Second) of Torts § 588); *Pease v. Windsor Dev. Review Bd.*, 2011 VT 103, ¶ 28, 190 Vt. 639, 645, 35 A.3d 1019, 1027 (clarifying that the doctrine of "[l]itigation immunity . . . protects parties, witnesses, lawyers, and judges as participants in the judicial process from liability for acts and conduct related to a proceeding") (internal quotation marks omitted); *see also Vt. Hard Cider Co., LLC v. Ciolek*, 2012 WL 761304, at *3 (D. Vt. Mar. 7, 2012) (explaining that "defamatory statements published by parties in the course of judicial proceedings are absolutely privileged, so long as they bear some relation to the proceedings") (internal quotations marks and alterations omitted). Courts have recognized that statements in a police report incorporated into an affidavit in support of probable cause fall within this privilege. *See, e.g., Seaworth v. Red Lake Cnty.*, 2007 WL 1964350, at *11 n.2 (D. Minn. July 2, 2007) (explaining that, even if the *pro se* plaintiff's complaint were read to assert a libel claim against the defendant police officer for statements contained in an affidavit in support of probable cause, the officer was entitled to "'absolute immunity from a civil suit in defamation for the statements made in the written police report'") (quoting *Carradine v. State*, 511 N.W.2d 733, 736-37 (Minn. 1994)).

To claim "full immunity" under Vermont law, the challenged statements must have been "pertinent to the matter in hand." *Letourneau v. Hickey*, 807 A.2d 437, 441 (Vt. 2002) (internal quotation marks omitted). In this case, the Affidavit and the statements contained therein were clearly pertinent to a determination of whether there

27

was probable cause to charge Plaintiff with misdemeanor domestic assault. Plaintiff therefore cannot establish the "lack of privilege in the publication." *Russin*, 2008 VT 22, ¶ 5, 183 Vt. at 303, 949 A.2d at 1020 (internal quotation marks omitted). Accordingly, Detective Tkac's motion for summary judgment on Count Eight is GRANTED.[8]

### 3.   Negligence.

A claim of negligence under Vermont law requires proof that the defendant owed the plaintiff a legal duty, that the defendant breached that duty, that the breach was the proximate cause of the injuries the plaintiff suffered, and that the plaintiff suffered actual loss or damage. *See Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 67-68, 968 A.2d 336, 340. "Duty, the first element, is central to a negligence claim, and its existence is primarily a question of law." *Id.*

In this case, Plaintiff's negligence claim is based on his contention that Detective Tkac owed him a duty "that he not be arrested without probable cause"; that Detective Tkac owed him a duty "not to prosecute a criminal matter absent probable cause and before he concluded his investigation"; and that Detective Tkac owed him "a duty not to make false or reckless statements about [Plaintiff]." (Doc. 33 at 8.) Plaintiff cites no authority recognizing the existence of a duty in these circumstances, and at least some state supreme courts have declined to hold that "police officers owe criminal suspects a duty to investigate beyond establishing probable cause prior to arrest." *Lahm v. Farrington*, 90 A.3d 620, 623, 626 (N.H. 2014); *Smith v. State*, 324 N.W.2d 299, 300 (Iowa 1982) (observing that courts have uniformly rejected a cause of action for negligent criminal investigations by police officers) (collecting cases); *see also Pourny v.*

---

[8] Detective Tkac has briefed whether he is entitled to summary judgment on an invasion of privacy claim for false light (*see* Doc. 64-1 at 27-28). Count Eight of the Amended Complaint asserts a claim for "invasion of privacy/defamation" based upon the elements under Vermont law for a claim of defamation. (Doc. 33 at 8-9.) Even if Count Eight could be construed to assert a false light claim, Plaintiff has failed to respond in his opposition to Detective Tkac's summary judgment motion with regard to this claim. Plaintiff has therefore abandoned his invasion of privacy claim. *See Zitta v. Graham*, 996 F. Supp. 2d 272, 280 (D. Vt. 2014) (ruling that a party's failure to respond to the defendant's motion for summary judgment with respect to certain claims results in abandonment of those claims) (collecting cases).

*Maui Police Dep't*, 127 F. Supp. 2d 1129, 1146 (D. Haw. 2000) ("There is no 'duty' to not arrest without probable cause.").

Here, the court need not resolve the issue of whether Vermont would recognize a cause of action for negligence arising out of an arrest and criminal prosecution because even if the alleged duties exist, there is no evidence of their breach. There was probable cause to arrest Plaintiff and continuing probable cause to charge and prosecute him. Because Plaintiff is unable to establish the essential elements of a negligence claim against Detective Tkac, summary judgment on Count Seven in Detective Tkac's favor is GRANTED.

### H.      Whether Chief Cutting and Deputy Chief Roberts Are Entitled to Summary Judgment on Plaintiff's State Law Claims.

Plaintiff asserts three causes of action against Chief Cutting and Deputy Chief Roberts for intentional infliction of emotional distress (Count Six), negligence (Count Seven), and private nuisance (Count Nine). All three claims are based on Plaintiff's contention that Chief Cutting and Deputy Chief Roberts "falsely" informed the Patels that Plaintiff's conditions of release prohibited him from continuing to reside at the Shady Lawn Motel. (Doc. 65 at 10-11.)

As previously noted, Plaintiff proffers no admissible evidence in support of these claims. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment."); *see also Anderson*, 477 U.S. at 249-50 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted). Instead, the undisputed facts reveal that neither Chief Cutting nor Deputy Chief Roberts advised the Patels that Plaintiff could not reside at the Shady Lawn Motel with Ms. Therrien. It is further undisputed that the Patels never prevented Plaintiff from living with Ms. Therrien once Plaintiff's conditions of release allowed this contact. On this basis alone, Chief Cutting and Deputy Chief Roberts have established that they are entitled to judgment in their

favor, and their motion for summary judgment on Counts Six, Seven, and Nine is GRANTED. *See Anderson*, 477 U.S. at 257 (requiring the nonmoving party to "present affirmative evidence in order to defeat a properly supported motion for summary judgment").[9]

### 1.    Intentional Infliction of Emotional Distress.

To support a claim of intentional infliction of emotional distress against Chief Cutting and Deputy Chief Roberts, Plaintiff "must show defendants engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct." *Fromson*, 2004 VT 29, ¶ 14, 176 Vt. at 399, 848 A.2d at 347 (internal quotation marks omitted).  Plaintiff alleges that Chief Cutting and Deputy Chief Roberts' outrageous conduct arises from their interactions with the Patels.  Plaintiff cites to no case in which truthful statements about court-imposed conditions of release constituted "conduct" that was "outrageous in the extreme." *Baptie*, 2013 VT 117, ¶ 25, 88 A.3d at 1219.  In addition, Plaintiff proffers no evidence that would support a claim that he suffered "distress so severe that no reasonable person could be expected to endure it" and that was "actually or proximately caused by the outrageous conduct" of Chief Cutting and Deputy Chief Roberts. *Fromson*, 2004 VT 29, ¶¶ 14-15, 176 Vt. at 399-400, 848 A.2d at 347-48 (internal

---

[9] Alternatively, Chief Cutting and Deputy Chief Roberts are entitled to summary judgment based on the defense of qualified immunity, which turns on the "objective legal reasonableness of the[ir] action[s], assessed in light of the legal rules that were clearly established at the time [they were] taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (internal quotation marks omitted).  In this case, it was objectively reasonable for Chief Cutting and Deputy Chief Roberts to take measures to attempt to ensure Ms. Therrien's safety at the time of the pending criminal prosecution against her alleged assailant. *See Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013) ("A police officer who has an objectively reasonable belief that his actions are lawful is entitled to qualified immunity.") (internal quotation marks omitted).  Moreover, Plaintiff cites to no case finding a constitutional "violation on facts even roughly comparable to those present in this case." *Ryburn v. Huff*, 132 S. Ct. 987, 990 (2012) (affirming analysis that focused on whether existing cases "specifically" addressed the factual "scenario" presented before the district court) (internal quotation marks omitted).  Because the court finds that Defendants are entitled to qualified immunity, it does not reach Defendants' additional argument regarding immunity for municipal officers pursuant to 24 V.S.A. § 901(a).

quotation marks omitted).  As a matter of law, even when regarded in the light most favorable to Plaintiff, the conduct of Chief Cutting and Deputy Chief Roberts was not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community." *Farnum*, 671 A.2d at 1256. Chief Cutting and Deputy Chief Roberts are entitled to judgment as a matter of law on Plaintiff's claim of intentional infliction of emotional distress, and the court thus GRANTS their motion for summary judgment on Count Six. *See Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 31, 175 Vt. 413, 427-28, 834 A.2d 37, 49 (affirming grant of summary judgment for defendant when the plaintiff failed "to identify any behavior . . . that could meet the legal standard for outrageousness").

### 2.  Negligence.

"To support a negligence claim, a plaintiff must show that the defendant owed her a legal duty, that the defendant breached that duty, that the breach was the proximate cause of the plaintiff's injury, and that she suffered actual loss or damage." *Lenoci v. Leonard*, 2011 VT 47, ¶ 9, 189 Vt. 641, 642, 21 A.3d 694, 697. Similar to the negligence claim against Detective Tkac, Plaintiff identifies no legal basis for imposing a legal duty on Chief Cutting and Deputy Chief Roberts under the circumstances of this case.  Even were there a duty, Defendants did not breach it when they informed the Patels of Plaintiff's conditions of release.  Chief Cutting and Deputy Chief Roberts are therefore entitled to judgment as a matter of law on Plaintiff's negligence claim, and the court GRANTS their motion for summary judgment on Count Seven.

### 3.  Private Nuisance.

"In order to be considered a nuisance, an individual's interference with the use and enjoyment of another's property must be both unreasonable and substantial." *Coty v. Ramsey Assocs., Inc.*, 546 A.2d 196, 201 (Vt. 1988).  A plaintiff claiming a nuisance has "to demonstrate actual and substantial injury." *John Larkin, Inc. v. Marceau*, 2008 VT 61, ¶ 10, 184 Vt. 207, 211, 959 A.2d 551, 554.  Plaintiff alleges that Chief Cutting and Deputy Chief Roberts interfered with his use and enjoyment of Room 130 through their conversations with the Patels regarding Plaintiff's conditions of release.  During the

31

course of the state prosecution, Plaintiff was never ordered to leave his room or evicted. Plaintiff has failed to demonstrate that he suffered an actual injury stemming from Defendants' alleged interference and interactions with the Patels. Even when regarded in the light most favorable to Plaintiff, Plaintiff did not suffer a "substantial" interference with his use and enjoyment of Room 130 as he remained in Room 130 during the entirety of the state prosecution. Chief Cutting and Deputy Chief Roberts are therefore entitled to judgment as a matter of law on Plaintiff's private nuisance claim, and the court GRANTS their motion for summary judgment on Count Nine.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment. (Doc. 64.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __17__ day of November, 2014.

Christina Reiss, Chief Judge
United States District Court